Dieter C. Dammeier SBN. 188759
Michael A. McGill SBN. 231613
Michael A. Morguess SBN. 192838
LACKIE & DAMMEIER LLP
367 North Second Avenue
Upland, CA 91786
Telephone: (909) 985-4003
Facsimile: (909) 985-3299

Attorneys for Plaintiffs
MICHAEL NEVEU

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| MICHAEL NEVEU,<br><br>              Plaintiff,<br><br>       v.<br><br>CITY OF FRESNO, a municipality;<br>JERRY DYER, individually;<br>MICHAEL GUTHRIE, individually;<br>GREG GARNER, individually;<br>DARREL FIFIELD, individually;<br>MARTY WEST, individually;<br>ROGER ENMARK, individually;<br>and DOES 1 THROUGH 10,<br><br>              Defendants. | Case No.: CIV-F-04-6490-OWW-LJO<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF INDIVIDUAL CIVIL RIGHTS AND LIBERTIES; SUPPLEMENTAL STATE LAW CLAIMS**<br><br>[42 USC §1983; CALIFORNIA GOVERNMENT CODE §53298; CALIFORNIA LABOR CODE §1102.5]<br><br>**DEMAND FOR JURY TRIAL** |

## I.

## PREFATORY

1.    This is an action for damages and injunctive relief for personal injury suffered by the PLAINTIFF as a result of the wrongful retaliation for lawful exercise of individual civil rights and liberties of free expression and for supplemental state law claims for violations of California whistleblower protections.

1

## II.

## JURISDICTION AND VENUE

2.    Subject matter jurisdiction is conferred by 28 USC §§1331 (Federal question) and 1343 [3] (Civil Rights). Federal supplemental jurisdiction over the state law claims is conferred by 28 USC §1367. Venue is proper in the Eastern District of California in that the wrongs alleged herein occurred within the City of Fresno, County of Fresno, within the Eastern District.

## III.

## PARTIES

3.    PLAINTIFF MICHAEL NEVEU ("NEVEU") was at all times relevant a police officer for FRESNO, and a member of the Fresno Police Officers Association. NEVEU holds his position as a vested and substantial property right, and is not to be removed, suspended, or reduced in his position, salary, or benefits except for cause.

4.    DEFENDANT CITY OF FRESNO ("FRESNO") is a duly enacted municipality operating under the laws of the State of California. FRESNO POLICE DEPARTMENT ("DEPARTMENT") is an operating Department of FRESNO. At all times relevant herein for all purposes connected with the management of employment relations matters within the DEPARTMENT, FRESNO delegated its final policy-making authority to DEFENDANT JERRY

2

DYER. FRESNO adopted and ratified each of the decisions of DEFENDANT

DYER as alleged herein as its own policies, customs, practices or decisions, as if

the same had been promulgated directly by FRESNO, except as expressly appears

herein to the contrary.

5.    DEFENDANT JERRY DYER ("DYER") was at all times relevant, as

he is now, the Chief of Police of FRESNO. DYER is sued individually. In doing

the things alleged herein, DYER acted under color of state law, within the course

and scope of his employment, and as an official policy-maker for FRESNO.

DYER is an official of FRESNO, vested with policy-making authority over actions

such as the ones at issue in this complaint.

6.    DEFENDANT ROGER ENMARK ("ENMARK"), was at all times

relevant, Captain and Deputy Chief for the DEPARTMENT. DEFENDANT

DARREL FIFIELD ("FIFIELD"), was at all times relevant, Deputy Chief for the

DEPARTMENT. ENMARK and FIFIELD are sued individually. In doing the

things alleged herein, ENMARK and FIFIELD acted under color of state law,

within the course and scope of employment, and as employees for FRESNO.

7.    DEFENDANT MICHAEL GUTHRIE ("GUTHRIE") was at all times

relevant, a Lieutenant for the DEPARTMENT. GUTHRIE is sued individually. In

doing the things alleged herein, GUTHRIE acted under color of state law, within

the course and scope of employment, and as employees for FRESNO.

8.     DEFENDANTS MARTY WEST ("WEST") AND GREG GARNER ("GARNER"), were at all times relevant, Captains for the DEPARTMENT. WEST and GARNER are sued individually.  In doing the things alleged herein, WEST and GARNER acted under color of state law, within the course and scope of employment, and as an employee for FRESNO.

9      DEFENDANT DOES 1 through 10, ("DOES") inclusive, are not known or identified at this time. On information and belief, PLAINTIFF alleges that each DOE is in some manner responsible for the wrongs alleged herein, and that each such DEFENDANT advised, encouraged, participated in, ratified, directed, or conspired to do, the wrongful acts alleged herein.  When the true names and capacities of said DEFENDANTS become known, PLAINTIFF will seek relief to amend this Complaint to show their true identities in place of their fictitious names as DOES 1 through 10.

10.    DEFENDANTS, and each of them, were the agent, employees and servants of every other DEFENDANT.  DEFENDANTS acted in the course and scope of said agency, service and employment at all relevant times.

## IV.

## FACTS COMMON TO ALL COUNTS

11.    NEVEU is a police officer employed by FRESNO since February

1995. Prior to working for FRESNO, NEVEU was a Deputy Sheriff/Deputy
Coroner for the San Benito County Sheriff's Department from January 1, 1991
through February 1995.

12.     NEVEU has over approximately 130 commendations during his
tenure with the DEPARTMENT; 16 commendations during the year 1995, 22
commendations during the year 1996, 22 commendations during the year 1997, 7
commendations during the year 1998, 10 commendations during the year 1999, 8
commendations during the year 2000, approximately 14 commendations during the
year 2001, 17 commendations during the year 2002, 5 commendations during the
year 2003 (out with shoulder injury from August 8, 2003, until February, 2004),
approximately 3 commendations to date (out with shoulder injury until February,
2004, and on Administrative Leave from February, 2004, until July, 2004.

13.     NEVEU has never scored anything below "exceeds expectations" on
any evaluation by any member of the DEPARTMENT.

14.     NEVEU has only one incident of discipline in his personnel record
spanning his career at FRESNO: failure to appear at a court proceeding because he
was working on a DEPARTMENT project.

15.     NEVEU'S exemplary performance and service has consistently been
recognized by other members of the DEPARTMENT, including his actual
Supervising Sergeants, and by members of other Law Enforcement Agencies as

well as community Organizations, Businesses, Schools, and members of the community including victims, their families and even suspects that NEVEU has arrested.

### The Protected Activity

#### *The Mata Allegations*

16.     On or about July 15, 1996, while still on his probationary period, NEVEU was transferred from patrol to the full-time position of Explorer Post Advisor due to an emergency suspension of the appointed full-time Advisor Richard Mata. Mata was suspended due to allegations of sexual molestation and subsequently investigated for sexual intimacy and improper behavior towards a teenage girl.

17.     Shortly after the transfer, NEVEU was called into Internal Affairs and informed by Internal Affairs Investigators that subsequent investigation of the Mata allegations would likely reveal additional victims, and that NEVEU was to report in writing anything he learned about possible additional victims or improper sexual behavior on Mata's part to both Internal Affairs and his immediate chain of command.

18.     Internal Affairs Investigators further indicated that NEVEU, being new to the DEPARTMENT, was unfamiliar with the "lay of the land," meaning the landscape, prior history, and personalities involved. Internal Affairs Investigators

indicated that it was necessary for NEVEU to report any information directly to Internal Affairs in writing since there were people inside NEVEU'S chain of command that might not want NEVEU to report anything, and in fact might order NEVEU not to document or report anything.

19. Internal Affairs Investigators instructed NEVEU that in the event the superiors in NEVEU'S chain of command in fact did make such a request, to inform whoever was giving such an order that, per the Internal Affairs Investigators, NEVEU was to comply with the Internal Affairs Investigators request and disregard any other orders.

20. Internal Affairs Investigators further indicated to NEVEU that in the event superiors in NEVEU'S chain of command made such a request and ordered NEVEU not to document or report the information stating that they outrank the Internal Affairs Investigators, NEVEU was to reply that the Internal Affairs Investigators order was given to them directly from the Chief of Police, Ed Winchester.

21. Within the first month as an Explorer Post Advisor, NEVEU learned of additional information relevant to the Mata allegations, including administrative improprieties that appeared designed to foster opportunities for further sex crimes.

22. As a result of the aforementioned improprieties, NEVEU was required to "talk down" two female Explorers who were potentially suicidal as a result from

1   depression stemming from the Mata allegations.

2
3        23.    Pursuant to the aforementioned Internal Affairs Investigators'

4   requests, NEVEU reported in writing all the information he obtained to Internal

5   Affairs as well as his direct chain of command, including Sergeant Dennis
6
7   Montejano, Lieutenant John Fries, and Captain MARTY WEST.

8        24.    On or around August 1996, the first written report was received by
9
10  Sergeant Montejano, wherein Sergeant Montejano called NEVEU into his office

11  and informed NEVEU it wasn't necessary to report anything in writing and that he,
12
13  meaning Montejano, would take care of it. NEVEU informed Montejano of the
14  aforementioned order by Internal Affairs, wherein Montejano angrily dismissed

15  NEVEU from his office.
16
17       25.    Within an hour or two, Sergeant Montejano called NEVEU into
18  Lieutenant Fries office wherein Montejano reiterated his previous order in Fries
19
20  presence. Montejano informed NEVEU that he was now being given new orders
21  and they were expected to be followed, as Lieutenant Fries outranked the Sergeant
22  from Internal Affairs who had given the previous order.
23
24       26.    When NEVEU indicated that he was going to comply with the
25  Internal Affairs Investigator's order, Fries left the office and returned with
26  Captain WEST. Captain WEST repeated Montejano and Fries' order and stated
27
28  that they, meaning Montejano and Fries,  were staff officers and that NEVEU was

8

just an officer, and that they knew what the correct thing to do and that NEVEU did not.

27.    Captain WEST ordered NEVEU not to put any information he obtained regarding the Mata allegations in writing, and to only verbally report it to Sergeant Montejano, and not to Internal Affairs, because Captain WEST, Lieutenant Fries, and Sergeant Montejano would decide what was relevant to the report.

28.    To that, NEVEU informed WEST that the Internal Affairs' order was pursuant to Chief Winchester and that he would follow Winchester's order. Captain WEST became angry that NEVEU was still going to report all sexual allegations or improprieties in writing to Internal Affairs. Captain WEST attempted to convince NEVEU to be a "team player" with them and follow their lead. Captain WEST further informed NEVEU that being a "team player" at FRESNO POLICE DEPARTMENT was important if an officer wanted to have a successful career, and by complying with WEST'S order, NEVEU would show WEST, Fries, and Montejano that he was a "team player." NEVEU refused to follow WEST'S order and reiterated that he was going to do exactly as Internal Affairs and Chief Winchester ordered. To that, Captain WEST stated to NEVEU that if he wanted "to play it that way," and "not be a team player" with them, that was his choice but there would be consequences.

29.    On or around December 23, 1996, NEVEU documented and reported to Lieutenant Fries and Sergeant Montejano racial harassment of Southeast Asian Explorers by Police Activity League volunteers, wherein Sergeant Montejano advised NEVEU that he should not have documented the racial harassment because it caused staff at the Police Activity League to become upset, including retired Deputy Chief Lee Piscola, and that "pissing off a retired Chief is a bad career move."

30.    On or around December, 1996, NEVEU submitted an extensive end of the year report documenting potentially embarrassing or troubling incidents involving Lieutenant Fries and Sergeant Montejano, including the "banking" of overtime hours, which were unlawfully denied to NEVEU. The report never reached Chief Winchester's office, as Captain WEST prevented this from happening.

31.    As a result of the FRESNO'S treatment of NEVEU, NEVEU requested and was transferred back to patrol on or about February, 1997 wherein Lieutenant Fries telephoned NEVEU'S Area Commander Lieutenant Downs and informed him that NEVEU was coming back out to patrol "because of a difference between management styles, between NEVEU and Sergeant Montejano."

*Testifying Before The Civil Service Commission*

32.    On or around March 2001, Chief of Police, DYER implemented a

new "Practical" phase to the promotional appointment to the Sergeant position.
DYER had publicly stated that he wanted control over who was promoted and did
not prefer outside individuals determining who his Sergeants were; as a result, the
"Practical" phase was introduced. This "Practical" phase was graded at fifty
percent of your final score used to select Sergeants, and allowed "pre-destined"
candidates whom DYER wanted as a Sergeant to be given the answers to the
"Practical" phase, thereby increasing their final score.

33.   The "Practical" phase was created by Sergeant Bruce Hartman at the
request of Lieutenant GARNER and Captain ENMARK. The "Practical" phase
was implemented by DYER.

34.   After the "Practical" phase was complete and the results release, some
candidates complained that the testing conditions at this "Practical" phase were
tainted and therefore inaccurate. The candidates grieved this issue, which
culminated in a hearing before the Civil Service Commission.

35.   NEVEU learned of the aforementioned scheme, and how some
candidates were unlawfully given the answers prior to taking the "Practical" phase
of the promotional exam. NEVEU informed attorneys handling the hearing before
the Civil Service Commission; those attorneys, on or about February 27, 2002,
asked the Commission for additional time to investigate this matter and to seek a
subpoena for NEVEU and his wife concerning this new evidence. Lieutenant

GARNER, who by the time of the hearing was named Captain, was the ranking staff officer present at the hearing representing the DEPARTMENT.

36.     The day after NEVEU informed attorneys handling the hearing before the Civil Service Commission that some promotional candidates were unlawfully given the answers prior to taking the "Practical" phase of the promotional exam, Captain GARNER brought NEVEU into his office, confronted NEVEU in a hostile manner and stated words to the effect that "Yesterday I spent the better part of the afternoon on the stand getting my ass chewed off and I only kept wondering one thing – why your name had come up as a witness." "For the past six months your name has not come up in this at all, except for being on the list, and I was wondering why it came up now." NEVEU informed GARNER that "I guess they want to know what I know." GARNER demanded that NEVEU tell him what he knew. NEVEU did not tell GARNER.

37.     In an attempt to discredit NEVEU'S testimony, Captain GARNER advised attorneys handling the hearing that NEVEU was a "crack pot," "screwball," and that he had "ethical problems." NEVEU also learned that two other staff officers had contacted the attorneys handling the hearing and made similar statements.

38.     On or about March 12, 2002, NEVEU, as well as his wife, testified before the Civil Service Hearing as to the improprieties and outright cheating in the

testing process.

39. NEVEU subsequently spoke with a Sergeant for the DEPARTMENT with regard to an Internal Affairs Investigation who informed NEVEU that a lot of staff wanted NEVEU'S head on a platter and that he had better be a "turtle" with his head and appendages tucked in, otherwise staff were going to chop them off at the first opportunity. The Sergeant further cautioned NEVEU to be careful, because those staff officers have many friends, they all protect each other and have very long memories.

40. On or around June 20, 2003, Lieutenant GUTHRIE stated to NEVEU that he needs to do good work to "erase the black mark" NEVEU has. GUTHRIE, in referring to "the black mark," was speaking of NEVEU'S disclosure of the Mata Allegations and testifying before the Civil Service Commission.

### The Retaliation

#### *Failure to Promote*

41. Between, approximately June 1997 to December 2002, Defendants WEST, FIFIELD, GUTHRIE and GARNER engaged in a series of related continuing retaliatory acts. Specifically, NEVEU applied for various promotions and selections to prestigious Special Units, passed the required tests and was put on eligibility lists, but was always skipped over. Officers with significantly less experience and who failed to even meet the minimum criteria for the positions were instead chosen. NEVEU was informed that at staff meetings, WEST,

1   FIFIELD, GUTHRIE, and GARNER always disapproved of any promotion or

2
3   selection of NEVEU to the respective Special Unit, despite NEVEU'S record and

4   commendations. NEVEU was informed that each time NEVEU'S name had come

5
6   up for any promotion or selection to Special Units in the past, it had always been

7   with praise, but that WEST, FIFIELD, GUTHRIE, and GARNER denied the

8   promotion or selection stating only that "NEVEU had problems in the Explorer

9
10  Post." NEVEU was denied each and every promotion as a result of WEST,

11  FIFIELD, GUTHRIE, and GARNER'S actions, and in retaliation for NEVEU

12
13  reporting the Mata allegations, the alleged racial harassment, and the end of the

14  year report as previously alleged, and testifying before the Civil Service

15  Commission. When questioned about this, a Lieutenant stated that NEVEU had a

16
17  "reputation as a trouble maker," and "wasn't a team player." The Lieutenant

18  further indicated that NEVEU had "pissed off" certain people in the

19
20  DEPARTMENT, and that they had "long memories" and that was how the

21  DEPARTMENT worked, and had always worked.

22       42.    On or about July 25, 2002, the Sergeants promotional list containing
23
24  NEVEU'S name was "killed" before reaching NEVEU'S name deliberately to

25  avoid promoting NEVEU in retaliation for testifying before the Civil Service
26
27  Commission.

28       43.    NEVEU was further informed that Captain WEST "and that group"

had done similar "black listing" to other officers who spoke up.

44.    The actions of Defendants, as alleged herein, fall within the
"continuing violations doctrine" which tolls the statute of limitations for alleged
violations that form part of a pattern of ongoing unlawful conduct. See Williams
v. Owens-Illinois, Inc. (9th Cir. 1982) 665 F. 2d 918, 924.

*Fitness for Duty Examination*

45.    On March 1, 2004, DYER and ENMARK, with the assistance of
GUTHRIE, placed NEVEU on administrative leave pending a fitness for duty
examination. NEVEU'S badge, identification, gun and keys were confiscated, and
NEVEU was further ordered to stay away from all DEPARTMENT buildings and
that he would be subject to arrest for trespassing, and terminated.

46.    NEVEU telephoned a Captain for the DEPARTMENT who told
NEVEU that he knew NEVEU had done nothing wrong and that this is how the
DEPARTMENT punishes people who have done nothing wrong themselves, but
speak up or complain against staff. The Captain stated that they punished him this
way twice, and last sent him to a psychologist in Napa named Dr. Mathis. The
Captain further cautioned NEVEU to check around on the psychologist the
DEPARTMENT was going to use, because the DEPARTMENT has those "hired
guns type psychologists" who might simply do the bidding of the DEPARTMENT.
A Sergeant for the Department further corroborated that Dr. Mathis had been used

by Chief DYER for the past year and a half for the "Chief's pet projects." The

DEPARTMENT attempted to send NEVEU to Dr. Mathis in Napa, until NEVEU

challenged the impartial nature of that selection.

47.    The document alleging justification to place NEVEU on

administrative leave pending the fitness for duty examination contained fabricated

and baseless accusations designed by DYER, ENMARK, and GUTHRIE solely to

retaliate against NEVEU for engaging in the aforementioned protected activities

and manufacture a basis upon which to terminate NEVEU.

48.    Additionally, the Defendant's actions in placing NEVEU on

administrative leave pending the fitness for duty examination has resulted in an

investigation by the State Department of Fair Employment and Housing

concerning discrimination, harassment, and retaliation on the basis of a perceived

medical condition.

49.    On April 7, May 17, 20, 25 and June 18, 2004, NEVEU was examined

and tested by psychologists, Dr. Richard Blak, Dr. Brian Sciaroni, Dr. David Rose,

and Dr. G.N. Cherney, respectively.  Dr. Blak certified NEVEU fit for duty on

April 10, 2004.  Drs. Sciaroni, Rose, and Cherney certified NEVEU fit for duty on

June 26, 2004.

50.    On or around July 6, 2004, Chief DYER and Deputy Chief ENMARK

refused to reinstate NEVEU despite three doctors clearing him for duty.  DYER

1    and ENMARK indicated that they needed the full reports from the psychologists,

2    and not just an ultimate conclusion that NEVEU was fit for duty.  After threat of

3

4    legal action, DYER and ENMARK authorized NEVEU to return to work.

5                                                **V.**

6

7                    **GOVERNMENTAL TORT CLAIM COMPLIANCE**

8            51.    Although a tort claim need not be filed in civil rights actions, Plaintiff

9
     MICHAEL NEVEU has filed a tort claim pursuant to *Government Code §§ 910 et*
10

11   *seq.* on November 1, 2004, and received a response dated December 13, 2004,

12
     which stated that any causes of actions accruing before November 1, 2003 were
13

14   returned without action because they were not presented within one year after the

15   incident.  The response did not address incidents occurring within six months of

16
     November 1, 2004, and therefore was taken as a rejection, permitting this action to
17

18   proceed.  Plaintiff has complied with all other conditions precedent to the

19
     maintenance of this action.
20

21           52.    Plaintiff has no plain, speedy, nor adequate remedy at law to prevent

22   future violations of his civil rights, and therefore seeks extraordinary relief in the

23
     form of permanent injunctions, as hereafter described.
24

25                                              **V.**

26                                        **COUNT ONE**

27

28   (Damages and Injunctive relief for violation of Federal Constitutional Rights

                                              17

against all defendants - 42 USC §1983)

53.     The allegations in paragraphs 1 through 52 are incorporated herein by

reference.

54.     The DEFENDANT'S actions as alleged herein, were designed to

retaliate against, intimidate, harass, and annoy NEVEU for the lawful exercise of

his Constitutional Rights. In doing the things alleged herein, defendants, and each

of them, violated the rights of PLAINTIFF MICHAEL NEVEU under the First and

Fourteenth Amendments to the United States Constitution to free expression,

association, and assembly including retaliation on behalf of the CITY OF

FRESNO, and its employees. The acts and omissions of DEFENDANTS, and

each of them, were done by DEFENDANTS under color of state law in their

capacity as a municipality under state law. Chief DYER'S actions, as alleged

herein, were taken as an official policy maker, and with the accompanying

authority to which DEFENDANT FRESNO delegated its governing powers in the

subject matter areas in which these policies were promulgated or decisions taken or

customs and practices followed. The acts and omissions of DEFENDANT DYER,

as alleged herein, manifested or conformed to official policies, customs, practices,

or decisions of DEFENDANT FRESNO, in that FRESNO delegated to DYER its

policy making authority in all matters of employment relations within the

DEPARTMENT, and/or DEFENDANT FRESNO, with knowledge of the afore

18

said policies, customs, practices and decisions of DEFENDANT DYER, approved, ratified and adopted said policies, customs, practices and decisions. It was or should have been plainly obvious to any reasonable policy making official of DEFENDANT FRESNO that the acts and omissions of DEFENDANTS as alleged herein, taking singly or in conjunction, directly violated and continued to violate PLAINTIFF MICHAEL NEVEU'S clearly established constitutional and statutory rights. In doing the things alleged herein, DEFENDANTS acted with malicious intent to violate PLAINTIFF'S rights, or at least in conscious, reckless, and callous disregard of PLAINTIFF'S rights and to the injurious consequences likely to result from a violation of said rights. General, special, and exemplary damages are sought according to proof. Punitive damages are sought against DEFENDANTS DYER, WEST, FIFIELD, and ENMARK, individually, according to proof. Damages alone are inadequate and Injunctive relief is sought to command DEFENDANTS to cease and desist from their repeated retaliatory acts.

**VI.**

**COUNT TWO**

(Supplemental state law claim for violations of California

Whistleblower Protections – Labor Code §1102.5)

(As Against DEFENDANT FRESNO)

55. The allegations in paragraphs 1 through 54 are incorporated herein by

19

reference.

56.    DEFENDANT FRESNO has violated California Labor Code 1102.5(b), which prohibits an employer from retaliating against an employee for disclosing information that the employee reasonably believes is a violation of a state or federal statute or violation or non-compliance with a state or federal regulation.

57.    DEFENDANT'S actions in placing NEVEU on administrative leave pending a fitness for duty examination, as alleged herein, were calculated to retaliate against and deter NEVEU from disclosing evidence of, among other things, sexual molestation, racial harassment, possible fraud in the "Practical" phase of the promotional examination as well as filing complaints with internal affair and human resources regarding harassment and retaliation. NEVEU was placed on administrative leave until approximately July 6, 2004, at which time the Defendants retaliatory actions became clear.

58.    A claim for violation of Labor Code §1102.5 is not within the province of the Labor Commissioner.

## VII.

## COUNT THREE

(Supplemental state law claim for violations of California

Whistleblower Protections – Government Code §53298)

(As Against All Defendants)

59.    The allegations in paragraphs 1 through 58 are incorporated herein by reference.

60.    By doing the Acts alleged herein, DEFENDANTS, each of them, violated whistleblower protections afforded PLAINTIFF under state law. DEFENDANTS have violated California Government Code §53298, which prohibits an employer, managers, and supervisors from taking a reprisal action against an employee for disclosing information regarding an abuse of authority or a substantial and specific danger to public health or safety. NEVEU'S written reports of sexual molestation by a former officer and racial harassment and complaints filed with the Human Resources Director, concern an abuse of authority and a substantial and specific danger to public health and safety.  Said complaints were filed in accordance with Government Code §53298 et seq., and NEVEU has completed each of the necessary prerequisites to maintaining this cause of action. DEFENDANT'S actions, in placing NEVEU on administrative leave pending a fitness for duty examination, as alleged herein, were calculated to retaliate against NEVEU for disclosing said information.

### DEMAND FOR JURY

Plaintiff hereby demands a jury trial under F.R. Civ. P., Rule 38 and E.D. Cal. Rule 38-201.

# III.

# PRAYER

WHEREFORE, Plaintiff prays:

1.    For general and special damages according to proof;

2.    For exemplary and punitive damages as against the individual

       Defendants only;

3.    For injunctive relief;

4.    For costs of suit;

5.    For attorneys fees under 42 USC §1988 and otherwise as permitted by

       law; and

6.    For other appropriate relief.

Dated: January 20, 2005                    Respectfully submitted,

                                           **LACKIE & DAMMEIER LLP**


                                           Michael A. McGill
                                           Attorneys for Plaintiff
                                           MICHAEL NEVEU

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN BERNARDINO

I am employed in the County of San Bernardino, State of California. I am over the age of 18 and not a party to the within action; my business address is 367 N. Second Ave., Upland, California 91786.

On March 3, 2005, I served the foregoing documents described as **Second Amended Complaint For Damages and Injunctive Relief for Violation of Individual Civil Rights and Liberties; Supplemental State Law Claims** on interested parties in this action by placing the true copies thereof enclosed in sealed envelopes addressed as follows:

Francine Kanne                     Betts & Wright
2660 Fresno Street                 7108 N. Fresno St., Ste. 460
Fresno, CA 93721                   Fresno, CA 93720
                                   Attn: Joseph Ruben

☐    BY MAIL: I caused such envelope with postage thereon fully prepaid to be placed in the United States mail at Upland, California. I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Upland, California in the ordinary course of business. I am aware that, on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐    BY PERSONAL SERVICE: I caused such envelope to be delivered by hand to the offices of the addressee.

☐    BY ELECTRONIC TRANSMISSION–VIA FACSIMILE: I caused all of the pages of the above-entitled documents to be sent to the indicated recipient noted above via electronic transmission (FACSIMILE OR FAX) at the indicated facsimile number.

Executed on March 3, 2005, at Upland, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_Julie E. Peterson_
Julie E. Peterson